## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

Martin LEVY and Michael LEVY      :
         Plaintiffs,          :
                 :
v.                        :        Case No: 3:06cv390(PCD)
                 :
CHRIS KICK             :
         Defendant.          :

## RULING ON MOTION FOR SUMMARY JUDGMENT

_____Plaintiffs Martin and Michael Levy bring this action against Defendant Chris Kick,

alleging a violation of the Fourth Amendment rights during a search of Michael Levy's motor

vehicle. Plaintiffs have also alleged a state common law claim for intentional infliction of

emotional distress. Defendant moves for summary judgment pursuant to Rule 56 of the Federal

Rules of Civil Procedure. For the reasons that follow, Defendant's Motion for Summary

Judgment [Doc. No. 21] is **granted**.

## I.     BACKGROUND

Plaintiffs Michael Levy and his father, Martin Levy, reside in Wolcott, Connecticut.

(Amend. Compl. ¶¶ 1, 2.) Defendant Chris Kick is a Trooper employed by the Connecticut State

Police. (Id. ¶ 4.) Martin Levy owned and insured a motor vehicle that he purchased for

Michael's use, primarily to get to and from the university he attended.[1] (Def.'s Local Rule

56(a)(1) Statement ¶ 2.) Michael had his own keys to the car. (Id.)

In the early morning hours of July 3, 2005, after spending the previous day at an outdoor

rock concert, Michael was driving his car home from Milford, Connecticut, where he had left the

---

[1] With regard to facts taken from Defendant's Local Rule 56(a)(1) Statement, the facts are admitted by
Plaintiff unless otherwise noted.

car at the house of his friend Mike Manoni. (Def.'s Local Rule 56(a)(1) Statement ¶ 3.) Two other friends, Dan Cocchiola and Dan Aherns, were in Michael's car with him riding home. (Id.) Michael got lost while trying to find the highway from Manoni's house, so Cocchiola, who was sitting in the front passenger seat, called Manoni from his cellphone for directions. (Id. ¶ ¶ 4, 5.) As Cocchiola received directions from Manoni, he relayed them to Michael. (Id. ¶ 5.) As he received directions, Michael drove the car under an overpass, where the road widened into three lanes. (Id. ¶ 6.) When Cocchiola told Michael to move into the left lane, he signaled and moved into the left lane. (Id.) Immediately thereafter, Cocchiola told Michael to switch back to the right lane, so he signaled and moved back into the right lane. (Id.) Cocchiola then told Michael to return to the left lane, so Michael again signaled and again switched back to the left lane. (Id.)

Defendant Kick was on patrol on Interstate Highway 95 in Stratford, Connecticut, on the morning of July 3, 3005, and he observed Michael's car repeatedly switching lanes within a short distance. (Def.'s Local Rule 56(a)(1) Statement ¶ 7.) Because it was early in the morning and he observed the car driving "erratically," Defendant pulled Michael over with the purpose of issuing a motor vehicle violation for an unsafe lane change and investigating the condition of the driver. (Id.) Michael pulled over to the right-hand shoulder of the highway and ended his cellphone conversation with Manoni. (Id.) According to Michael's cellphone record, his call to Manoni ended at 3:14 a.m. (Id. ¶ 8.) Defendant exited his cruiser and approached Michael's car, asking for Michael's license and registration. (Id. ¶ 9.) Michael handed Defendant his license and registration, and Defendant asked Michael several questions, including where he was going, where he was coming from, and if he had been drinking or using drugs. (Id. ¶ 10.) Michael responded that he and the other passengers were very tired because they had been at a rock

concert all day in New Jersey and were lost trying to get home. (Id. ¶ 11.)

Defendant claims that while he was talking to Michael, he shined his flashlight into the vehicle and noticed that Cocchiola had dilated pupils, which he knew from his training to be a sign of drug or alcohol use. (Def.'s Local Rule 56(a)(1) Statement ¶ 12.) According to Defendant, he asked Michael and the other passengers if they had taken drugs, and they responded that they had not. (Id.) He also claims to have asked Cocchiola why his pupils were dilated, to which Cocchiola responded that he did not know. (Id. ¶ 13.) Defendant states that he asked Cocchiola to step out of the car to ask him questions, while Michael and Aherns remained seated inside. (Id.) Michael, however, claims that Defendant ordered Cocchiola out of the car because he had them pinned as drug addicts. (Pls.' Local Rule 56(a)(2) Statement ¶ 13.) Once Cocchiola stepped out of the car, Defendant asked him several questions, after which he returned to the vehicle. (Id. ¶ 14.)

Defendant then asked Michael to step out of the vehicle, which he did immediately and without any verbal protest. (Def.'s Local Rule 56(a)(1) Statement ¶ 15.) According to Michael's deposition testimony, he complied with the order because he knew he had not done anything wrong. (Exhibit C, Michael Levy Dep. 33:7-15.) Defendant asked Michael if Cocchiola was on drugs, and Michael said that he was not. (Def.'s Local Rule 56(a)(1) Statement ¶ 16.) Michael testified that he was disappointed Defendant did not believe that they were not drug users, but that he knew that Defendant was just doing his job. (Id. ¶ 17.) Defendant then asked Michael if they had been drinking. Michael replied that they had not been drinking that night but that there was alcohol in the trunk. (Id. ¶ 18.) When he finished questioning Michael, Defendant told Michael to return to the car. (Id. ¶ 19.)

Defendant claims that he then asked the backseat passenger, Aherns, if he was on any drugs. Aherns responded that he was not but that he had prescription medication with him. (Def.'s Local Rule 56(a)(1) Statement ¶ 20.) Defendant claims that he asked Aherns to see the prescription, looked through the bottle, and returned it to him. (Id.) Michael, however, claims that Defendant did not ask to see the prescription but ordered Aherns to hand it over. (Pls.' Local Rule 56(a)(2) Statement ¶ 20.) Defendant returned to his cruiser to run a DMV check on Michael's license and registration. (Def.'s Local Rule 56(a)(1) Statement ¶ 21.) While Defendant was in his cruiser, a Stratford police officer in another police car stopped and asked if he needed assistance. (Id. ¶ 22.) Defendant discussed his suspicions with the police officer, and then he returned the license and registration to Michael. (Id. ¶ 23.)

At this point, Defendant conducted two searches of Michael's car, the circumstances leading up to which are disputed by the parties. Defendant contends that he asked Michael if he could search his vehicle for drugs, and that Michael responded by saying, "I don't care. I have nothing to hide, sure," while exiting the vehicle and opening the trunk. (Def.'s Local Rule 56(a)(1) Statement ¶ 24.) Michael, however, claims he got out of the car and opened the trunk because Defendant, who was wearing a police uniform and badge and had his gun visible to Michael, ordered him to do so. (Pls.' Local Rule 56(a)(2) Statement ¶¶ 24, 25.) He claims that he was coerced into consenting to the search of his car and that his statement did not constitute voluntary consent. (Id.) Michael also attests that he did not object to Defendant's search because he felt such an objection would be used against him and he "didn't want to cause any trouble." (Michael Levy Dep. 71:23-4; see also Pls.' Local Rule 56(a)(2) Statement ¶¶ 24, 25.) As Michael testified at his deposition, "I felt like I had no choice, that I had to do it or else it would

cause more problems. That was the attitude he was portraying." (Michael Levy Dep. 72:24-25, 73:1; see also Pls.' Local Rule 56(a)(2) Statement ¶¶ 24, 25.) He also claims that he was afraid of the consequences of refusing the search: "I felt like he was harassing us, and if I didn't do what he said, then I had no choice, then something worse would come out of it, maybe a higher price ticket at the very least." (Michael Levy Dep. 74:3-6; see also Pls.' Local Rule 56(a)(2) Statement ¶ ¶ 24, 25.)

Michael and the two passengers stood with the Stratford police officer as Defendant searched the entire vehicle but found no narcotics. (Def.'s Local Rule 56(a)(1) Statement ¶ 27.) Defendant then asked Michael if he would allow a canine sniff search of his car to further search for narcotics. (Id. ¶ 28.) The parties dispute whether Michael consented to the canine sniff search of his vehicle. (Id.) Defendant claims that after he asked Michael if he would consent to this search, Michael responded without hesitation, "okay, . . . whatever you want to do." (Id.) Defendant also maintains that Michael did not ask if he had to comply with the canine search or what options were available to him. (Id.) Michael, however, claims that he was coerced into consenting to the canine search. (Pls.' Local Rule 56(a)(2) Statement ¶ 28.) He testified at his deposition that he did not feel as if he had a choice and that he was afraid he would be arrested if he did not comply. (Michael Levy Dep. 70-74; see also Pls.' Local Rule 56(a)(2) Statement ¶ 28.) The Stratford police officer had the narcotics dog search the entire car but did not find any narcotics. (Def.'s Local Rule 56(a)(1) Statement ¶ 29.) Defendant then told Michael and his friends to get back into the vehicle. (Id. ¶ 30.) Defendant claims that at no point did he put his hand on his gun, draw his gun, handcuff any of the passengers, threaten them with arrest or with a long detention, or intimidate them in any way (id. ¶ 31), though Michael claims he was

intimidated by Defendant.  (Pls.' Local Rule 56(a)(2) Statement ¶ 31.)

After completing the searches, Defendant issued Michael a ticket for an unsafe lane change.  (Def.'s Local Rule 56(a)(1) Statement ¶ 32.)  He then gave Michael directions to the highway.  (Id. ¶ 33.)  Once on the highway, Michael called his father, Martin, on his cellphone and left him a voicemail.  (Id. ¶ 33.)  Michael's cellphone records show this call occurring at 3:47 a.m.  (Id.)  Defendant claims that the phone record proves that the entire stop lasted less than thirty-three minutes (id. ¶ 35), though Michael claims instead that the entire stop took "hours." (Pls.' Local Rule 56(a)(2) Statement ¶ 35.)  The following morning, Michael spoke about the incident on the phone with Martin, who was vacationing in Florida at the time and who did not cut short his trip as a result of this incident.  (Pls.' Local Rule 56(a)(2) Statement ¶ 36.)

Michael claims he suffers from severe emotional distress as a result of Defendant's actions, alleging that the incident affected him physically and caused him to fear police officers. (Pl.'s Interrogs. ¶¶ 6, 7.)  Michael now experiences stress when stopped by the police, though he claims he "still likes good cops."  (Def.'s Local Rule 56(a)(1) Statement ¶ 40.)  He has not, however, spoken to a mental health professional regarding this stress.  (Id.)  Additionally, Martin Levy claims that Defendant caused damage to the vehicle during the canine sniff search. (Pl. Martin Levy's Interrogs. ¶¶ 10, 22.)

On May 16, 2006, Plaintiffs filed an amended complaint against Defendant pursuant to 42 U.S.C. § 1983[2] alleging a violation of their Fourth Amendment rights resulting from this search

---

[2] 42 U.S.C. § 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law that any person who, acting under color of law." 42 U.S.C. § 1983.

and seizure and alleging a state law claim of intentional infliction of emotional distress.  On

April 16, 2007, Defendant submitted a Motion for Summary Judgment pursuant to Fed. R. Civ.

P. 56 on all of Plaintiffs' claims.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate only when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law."  FED. R. CIV. P. 56(c).  No genuine issue of material fact exists and summary judgment

is therefore appropriate when "the record taken as a whole could not lead a rational trier of fact to

find for the non-moving party."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S.

574, 587 (1986).  A material fact is one which "might affect the outcome of the suit under the

governing law," and an issue is genuine when "the evidence is such that a reasonable jury could

return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986).  Importantly, however, "[c]onclusory allegations will not suffice to create a genuine

issue."  Delaware & H.R. Co. v.Conrail, 902 F.2d 174, 178 (2d Cir. 1990).  The moving party

bears the burden of establishing that summary judgment is appropriate.  Anderson, 477 U.S. at

225.  "A defendant need not prove a negative when it moves for summary judgment on an issue

that the plaintiff must prove at trial.  It need only point to an absence of proof on the plaintiff's

part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine

issue for trial.'"  Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001) (quoting

Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)); see also Gallo v. Prudential Residential

Servs. Ltd. P'ship, 22 F.3d 1219, 1223-24 (2d Cir. 1994) ("The moving party may obtain

summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case.").

## III.    DISCUSSION

### A.    Martin Levy's Fourth Amendment Claim

Defendant first moves for summary judgment on Martin Levy's claim alleging a violation of his Fourth Amendment rights on the ground that Martin lacks standing to bring such a claim. "[W]hen standing is placed in issue in a case, the question is whether the person whose standing is challenged is a proper party to request an adjudication of a particular issue and not whether the issue itself is justiciable." Flast v. Cohen, 392 U.S. 83, 99-100 (1968). The Article III case-or-controversy requirement underpins the requirement that a plaintiff must have standing to bring a lawsuit. See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 180 (2000); Lujan v. Defenders of Wildlife, 504 U.S. 555, 559 (1992); Warth v. Seldin, 422 U.S. 490, 498 (1975). "To satisfy the 'case' or 'controversy' requirement of Article III, which is the 'irreducible constitutional minimum' of standing, a plaintiff must, generally speaking, demonstrate that he has suffered 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision." Bennett v. Spear, 520 U.S. 154, 162-63 (1997). In addition to these "immutable requirements of Article III, the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing." Id. In particular, the Supreme Court has held "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 474 (1982) (quoting Warth, 422 U.S. at 499).

In this case, Martin brings a Fourth Amendment claim against Defendant for the allegedly unlawful traffic stop and seizure of his son, Michael. (Amend. Compl. ¶ 14.) Martin asserts that he has standing to bring this claim because he owned Michael's car and because the car's upholstery was permanently damaged during the searches. (Pls.' Reply 8.) These facts do not, however, satisfy the requirements of standing. When Martin gave Michael the keys to his car, Martin relinquished control of the car and transferred to Michael any right and authority to consent to a search of the vehicle. Because he possessed common authority over the vehicle at the time of the traffic stop, <u>Michael</u> had a right under the Fourth Amendment to be free from a warrantless search of the car. <u>See</u> <u>Illinois v. Rodriguez</u>, 497 U.S. 177, 181 (1990). <u>Martin</u>, however, correspondingly lost any general Fourth Amendment interest in the car when he gave the keys to Michael. "Fourth Amendment rights are personal to each defendant and may not be asserted vicariously." <u>United States v. Torres</u>, 162 F.3d 6, 10 (1st Cir. 1998), <u>cert. denied</u>, 119 S. Ct. 1370 (1999); <u>see also United States v. Padilla</u>, 508 U.S. 77, 81-82 (1993); <u>Rakas v. Illinois</u>, 439 U.S. 128, 130 n. 1, 133-34 (1978). Because Martin was not present at the time of the traffic stop, he could not have suffered any injury-in-fact beyond the search of the vehicle. As owner of the car, Martin may have standing to assert a property damage claim against Defendant for the alleged damage to the car's upholstery; however, this property damage does nothing to resurrect Martin's Fourth Amendment interest in the vehicle in which he was not present and over which Michael had control at the time. Accordingly, Martin lacks standing to bring a Fourth Amendment claim against Defendant Kick in this case, and Defendant's motion for summary judgment on Martin's § 1983 claim is hereby granted.

**B.      Michael Levy's Fourth Amendment Claim**

Michael Levy claims, pursuant to 42 U.S.C. § 1983, that Defendant violated his right under the Fourth Amendment to be free from warrantless and unreasonable searches. (Amend. Compl. ¶ 7.) The Fourth Amendment of the United States Constitution states: "the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. CONST. AMEND. IV. This right applies to the states pursuant to the fourteenth amendment. Katz v. United States, 389 U.S. 347, 350-51 (1967). The touchstone of an analysis under the Fourth Amendment is always "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security," Terry v. Ohio, 392 U.S. 1, 19 (1968), and that reasonableness depends "on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975). An automobile stop is thus subject to the constitutional imperative that it not be "unreasonable" under the circumstances. Whren v. United States, 517 U.S. 806, 810 (1996). In his Amended Complaint, Michael alleges that Defendant lacked probable cause to stop the car, and that his consent to Defendant's searches of the car was not voluntary. (Amend. Compl. ¶ 7.) In his motion for summary judgment, Defendant argues that no genuine issue of material fact exists on either aspect of Michael's claim.

### 1. Probable Cause

Michael Levy alleges that Defendant violated the Fourth Amendment by stopping Michael's vehicle and questioning its passengers without probable cause to do so. (Amend. Compl. ¶ 7.) Defendant contends that he had probable cause to stop the vehicle and question the passengers because he observed the vehicle commit a traffic violation. (Def.'s Mem. Supp.

Summ. J. 7.)  In their Reply Brief, Plaintiffs appear to concede that Defendant had probable

cause to make the traffic stop.  (Pls.' Reply 6.)  The Court will nevertheless address this issue to

determine if, as a matter of law, Defendant had probable cause to make the stop.

When a police officer stops a motor vehicle, the temporary detention of the individuals

"even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons.'"

Whren, 517 U.S. at 809.  To comply with the Fourth Amendment, police officers must therefore

have probable cause in order to stop a vehicle for a traffic violation.  Id. at 810 ("as a general

matter, the decision to stop an automobile is reasonable where the police have probable cause to

believe that a traffic violation has occurred"); Delaware v. Prouse, 440 U.S. 648, 654-55 (1979);

Cardona v. Connolly, 361 F. Supp. 2d 25, 29 (D. Conn. 2005).  Probable cause is defined as

"sufficient to warrant a prudent man in believing that the suspect had committed or was

committing an offense."  Gerstein v. Pugh, 420 U.S. 103, 111 (1975) (internal citations and

quotation marks omitted).  An objective inquiry, not an analysis of the subjective intent of the

police officer, is required in determining probable cause.  Whren , 517 U.S. at 813.

A police officer has probable cause to stop a car when he observes a minor traffic

violation.  See, e.g., United States v. Scopo, 19 F.3d 777, 781-82 (2d Cir. 1994) (police had

probable cause to stop car where driver failed to signal while changing lanes in violation of state

traffic law); Cardona, 361 F. Supp. 2d at 29 (probable cause to stop vehicle where plaintiff ran

red light); Waksman v. Cohen, No. 95 Civ. 3913 (WK), 1998 WL 690091, at *4 (S.D.N.Y. Sept.

30, 1998) (probable cause to stop car in which air freshener was hanging from rear view mirror in

violation of state law).  In this case, Defendant observed Michael commit a traffic violation when

he switched lanes three times within a short period of time.  (Def.'s Local Rule 56(a)(1)

Statement ¶ 6.)  Regardless of the reason why Michael committed this traffic violation,

Defendant had probable cause to pull over the vehicle once he observed this traffic violation.

See Scopo, 19 F.3d at 780-81.

Once an officer lawfully pulls over a vehicle, he may as a matter of course order the

drivers and passengers to exit the car.  Maryland v. Wilson, 519 U.S. 408, 410 (1997) ("an

officer making a traffic stop may order passengers to get out of the car pending completion of the

stop"); see also Cardona, 361 F. Supp. 2d at 30.  The officer may also ask the individuals

questions regarding the officer's suspicions.  See Berkemer v. McCarty, 468 U.S. 420, 439

(1984) ("the officer may ask the detainee a moderate number of questions to determine his

identity and to try to obtain information confirming or dispelling the officer's suspicions").

Because Defendant Kick had probable cause to pull over Michael's vehicle, his conduct

remained within the bounds of the Fourth Amendment when he questioned Michael and the other

passengers about his suspicions.  Defendant's questions sought to confirm or dispel his

suspicions of their drug or alcohol use, given the time of the incident, Michael's erratic lane

changes, and Cocchiola's dilated pupils.  (Def.'s Local Rule 56(a)(1) Statement ¶ 7, 10-13.)

After initial questioning, he found out that the individuals were coming back from an all-day

rock concert and wanted to further confirm or deny his suspicions of alcohol or drug use related

to that event.  (Id. ¶ 10.)  Given the situation, Defendant did not violate Michael's Fourth

Amendment rights by stopping the car or questioning him or the other passengers.

## 2. Voluntary Consent

Defendant also moves for summary judgment on the ground that his warrantless searches

of Michael's vehicle were constitutionally sound because Michael voluntarily consented to both

searches.  (Def.'s Mem. Supp. Summ. J. 10.)  Under the Fourth and Fourteenth Amendments, a "search conducted without a warrant issued upon probable cause is '*per se* unreasonable. . . subject only to a few specifically established and well-delineated exceptions.'"  Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (quoting Katz, 389 U.S. at 357); see also Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971); Chambers v. Maroney, 399 U.S. 42, 51 (1971).  One of the specifically established exceptions to the warrant requirement is a search that is conducted pursuant to consent.  Schneckloth, 412 U.S. at 219 (citations omitted).  The question whether consent was voluntary "or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances."  Schneckloth, 412 U.S. at 227; see also United States v. Tutino, 883 F.2d 1125, 1137 (2d Cir. 1989); United States v. Puglisi, 790 F.2d 240, 243 (2d Cir.), cert. denied, 479 U.S. 827 (1986).

To determine the totality of circumstances, the fact-finder must search through the "unique facts and circumstances" of each case and to ascertain whether in fact consent was voluntary or coerced.  Schneckloth, 412 U.S. at 233.  In determining if consent was coerced, "account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents."  Matter of 2029 Hering Street, Bronx, N.Y., 464 F. Supp. 164, 171 (2d Cir. 1979) (citing Schneckloth, 412 U.S. at 229).  Other factors to consider in determining voluntary consent include, but are not limited to, age of the subject, level of education, level of intelligence, and the presence of any physical abuse.  U.S. v. Sanchez, 635 F.2d 47, 58 (2d Cir. 1980).  Although the subjective state of the agreeing party must be considered, mere "assertions or manifestations of authority ([i.e. the fact that defendant] was a police officer and had a gun) are insufficient to establish coercion."  Stone v. Westport, 411 F.

Supp. 2d 77, 85 (D. Conn. 2006). There must be additional information besides the fact that the officer was wearing a uniform, badge, and gun to show that the consent was involuntary. Id.

In cases where the parties "offer conflicting versions of the relevant facts, the voluntariness determination turns on the court's assessment of the credibility of the witnesses." United States v. Milan-Colon, Nos. S2, S3 91CR.685 (SWK), 1992 WL 236218, at *35 (S.D.N.Y. Sept. 8, 1992). Because the Court cannot weigh the credibility of witnesses or evidence on a motion for summary judgment, cases which present different versions of the relevant facts needed for determining consent cannot be decided by the court, but must be presented as a question for the jury. Id.

In this case, the parties present contradicting facts regarding the voluntariness of Michael's consent. There is no dispute that Defendant asked Michael if he could search the car and that Michael replied, "I don't care. I have nothing to hide, sure." (Def.'s Local Rule 56(a)(1) Statement ¶ 24.) If the standard for determining whether consent was "voluntary" was simply to analyze the statement on its face, then this statement would clearly indicate consent to the search. The Schneckloth test, however, requires an inquiry into the totality of the circumstances, which in this case raises questions of disputed facts. Defendant claims that he simply asked Plaintiff if he could search the car and received an affirmative answer. (Def.'s Local Rule 56(a)(1) Statement ¶ 24.) Plaintiff, however, claims that he was coerced into agreeing to the search, fearing that if he refused to agree that "something worse would come out of it," possibly resulting in arrest. (Pls.' Local Rule 56(a)(2) Statement ¶ ¶ 24, 25.) He explained that he "didn't want to cause any trouble" and felt that the police officer was harassing him, accusing him and his passengers of being drug dealers, and using his authority as a policeman through his badge,

14

gun, and uniform to force Michael into verbalizing consent to the search. (Id.) Although the

facts as presented by Plaintiff do not show express coercion on the part of Defendant, they may

be construed to demonstrate implied coercion. Schneckloth, 412 U.S. at 226.

The parties also dispute the voluntariness of Michael's consent to the canine sniff search.

There is no dispute that in response to Defendant's request to conduct a second search of the car

with a narcotics canine, Plaintiff said, "okay . . . whatever you want to do." (Def.'s Local Rule

56(a)(1) Statement ¶ 28.) Defendant claims that this was a voluntary response, presented without

coercion and without any hesitation on part of the Plaintiff. (Id.) He also states that Plaintiff did

not ask what his options were in terms of complying with the search. (Id.) Plaintiff, however,

claims that he was coerced into complying with the search and "didn't feel like I had a choice."

(Pls.' Local Rule 56(a)(2) Statement ¶ 28.) Once again, Michael felt that he needed to agree to

the search or he would potentially be arrested or cause further problems. (Id.)

Because there is a dispute regarding material facts as to the voluntariness of consent

based on the totality of circumstances, this issue cannot be decided on a motion for summary

judgment. Although Michael's assertions of coercion based on the fact that Defendant was

dressed in his police uniform do not by themselves prove coercion, see Stone, 411 F. Supp. 2d at

85, there is enough additional evidence as to the factual surroundings of Michael's consent to

present a genuine issue of material fact. It is not the Court's role to weigh the evidence and

credibility of the parties' statements on a motion for summary judgment. See Anderson, 477

U.S. at 249. Rather, a question of fact that turns on the credibility of witnesses must be

determined by a fact-finder at trial. For these reasons, the Court cannot grant summary judgment

to Defendant on Michael's Fourth Amendment claim as a matter of law.

## C.      Qualified Immunity

Defendant also moves for summary judgment on Michael's Fourth Amendment claim on the ground that he is entitled to qualified immunity.  (Def.'s Mem. Supp. Summ. J. 16.)  In a civil rights action against a police officer, an officer can assert the privilege of qualified immunity.  Saucier v. Katz, 533 U.S. 194, 200 (2001).  This privilege prevents government officials from the costs and burdens of unnecessary trials by settling cases early on in the litigation process.  Id. at 201 (citation omitted) ("The privilege is 'an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.").

Courts engage in a two-step inquiry to determine whether a defendant is entitled to qualified immunity.  The first step is to determine if the facts alleged, viewed in the light most favorable to the party claiming the injury, show the officer's conduct violated a constitutional right.  Saucier, 533 U.S. at 201.  If a constitutional violation could be made out on a favorable view of the parties' submissions, the next question for the Court is whether the right was clearly established.  Id.  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Id. at 202.  See also Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Holeman v. City of New London, 425 F.3d 184, 189 (2d Cir. 2005); Golino v. City of New Haven, 950 F.2d 864, 870 (2d Cir. 1991); Lin v. Lozinski, No. Civ. 300CV2045 (AHN), 2004 WL 1543194, at *3 (D. Conn. March 1, 2004).  If a reasonable officer would know that the alleged conduct is unlawful, then the defendant officer is not entitled to qualified immunity.

Viewed in the light most favorable to Michael, the injured party, the facts alleged show

16

that Defendant's conduct violated Michael's Fourth Amendment right to be free from a

warrantless search. Having satisfied the threshold question of the test, the Court moves to the

second step of the analysis to determine whether the right was clearly established. Protection

against a warrantless and unreasonable search and seizure is a clearly established right, and

conducting a warrantless search without a clear exception to the warrant requirement directly

violates the Constitution. See Katz, 389 U.S. at 358. The key question is thus whether it would

be objectively reasonable for an officer in Defendant Kick's position to conclude that his conduct

was lawful.

Defendant claims that even if the Court determines that he violated Michael Levy's

Fourth Amendment rights, a reasonable officer in his position would view his conduct as lawful

under the circumstances. (Def.'s Mem. Supp. Summ. J. 16.) This Court agrees. In order to be

entitled to qualified immunity at the summary judgment stage, "the officer must adduce sufficient

facts that no reasonable jury, looking at the evidence in the light most favorable to, and drawing

all inferences most favorable to, the plaintiff, could conclude that it was objectively unreasonable

for the officer to believe" that his acts did not violate Plaintiff's rights. Golino, 950 F.2d at 870.

In this case, Plaintiff verbally agreed to the search without hesitation. (Def.'s Local Rule

56(a)(1) Statement ¶ 24.) Plaintiff failed to ask Defendant any questions regarding the necessity

of the searches; he also failed to express to Defendant any indication that he was uncomfortable

in the situation or not fully consenting to the searches. (Id.) There is no evidence, other than the

fact that Defendant wore a police uniform, that Defendant made any affirmative moves that could

be construed to expressly or impliedly coerce Michael into consenting to either search. A

reasonable officer would therefore conclude that Defendant's behavior was respectful of

Michael's rights and therefore objectively reasonable under the circumstances.  See Holeman,

425 F.3d at 192 (police officer entitled to qualified immunity where it was objectively reasonable

for him to believe he received consent to search stopped vehicle); Gagne v. DeMarco, 281 F.

Supp. 2d 390, 397 (D. Conn. 2003) (same).  Defendant's Motion for Summary Judgment on

Michael's Fourth Amendment claim is therefore granted on the basis that Defendant is entitled to

qualified immunity.

     **D.**     **Intentional Infliction of Emotional Distress**

     Plaintiffs also bring a state common law claim alleging that Defendant's conduct during

the traffic stop constituted intentional infliction of emotional distress.  (Amend. Compl. ¶ 15.)

Defendant moves for summary judgment on the grounds that neither plaintiff suffered an injury

and that Defendant's actions were not extreme or outrageous.  (Def.'s Mem. Supp. Summ. J. 13.)

To assert a claim of intentional infliction of emotional distress, a plaintiff must establish: (1) that

the defendant intended to inflict emotional distress or knew or should have known that emotional

distress was the likely result of its conduct; (2) that the conduct was extreme and outrageous; (3)

that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional

distress sustained by the plaintiff was severe.  Appleton v. Bd. of Educ., 245 Conn. 205, 210

(Conn. 2000).  The standard for a claim of intentional infliction of emotional distress is strict and

hinges on whether the conduct satisfies the requirement of "extreme and outrageous behavior."

Id. at 210.  Conduct must exceed "all possible bounds of decency, and [should] be regarded as

atrocious, and utterly intolerable in a civilized community."  Id.  "Conduct on the part of the

defendant that is merely insulting or displays bad manners or results in hurt feelings is

insufficient to form the basis for an action based upon intentional infliction of emotional

distress." Id. at 211 (quoting Mellaly v. Eastman Kodak Co., 42 Conn. Supp. 17, 19 (Conn. Super. Ct. 1991)).  If reasonable people could differ as to whether the conduct constitutes extreme or outrageous behavior, the question is one for the jury.  Kilduff v. Cosential, Inc., 289 F. Supp. 2d 12, 22 (D. Conn. 2003) (citing Appleton, 254 Conn. at 210).

Neither Plaintiff has provided evidence to support a claim for intentional infliction of emotional distress.  Martin cannot assert this claim because he neither suffered nor could have suffered an injury from Defendant's conduct.  Because Martin was not present at the time of the incident and had no direct contact with Defendant, he could not have suffered an injury-in-fact during the traffic stop and therefore has no standing to bring a claim of emotional distress based on these facts.  Michael has also failed to establish a viable claim because Defendant's behavior during the incident was not so extreme and outrageous as to prove a prima facie claim of emotional distress.  Viewing the facts most favorably to Michael, the most that Defendant did during the traffic stop was force Michael to consent to the two searches and detain him for a short period of time in the process.  Defendant may have caused Michael to feel as if he was being treated like drug-dealer or that he would be arrested if he did not comply with Defendant. This conduct, however, does not "exceed all possible bounds of decency" and cannot be regarded as "atrocious" in a civilized community.  Compare Whelan v. Whelan, 41 Conn. Supp. 519, 523 (Conn. Super. Ct. 1991) (finding extreme and outrageous behavior where husband falsely told wife he tested positive for AIDS); Benton v. Simpson, 78 Conn. App. 746, 748 (Conn. App. 2003) (finding extreme and outrageous behavior where defendant, plaintiffs' boss, used profanity and made abusive statements about them in public).  Even if Michael found Defendant's behavior insulting, it simply does not qualify as extreme and outrageous.  See Mellaly, 42 Conn.

Super. at 18.

Michael's claim also fails because he has not shown that he experienced severe emotional distress as a result of the traffic stop. Michael admits that the only emotional damage sustained is a "fear of cops, but not all cops," and general anxiety. (Def.'s Local Rule 56(a)(1) Statement ¶ 40.) Even if Defendant's conduct caused this stress, it does not qualify as sufficiently severe to substantiate an emotional distress claim. Plaintiff has not shown that his emotional distress was severe "at a level which 'no reasonable person could be expected to endure'" or that he experienced symptoms "'to an extraordinary degree.'" Lachira v. Sutton, No. 3:05cv1585 (PCD), 2007 WL 1346913, at *23 (D. Conn. May 7, 2007) (quoting Almonte v. Coca-Cola Bottling Co., 959 F. Supp. 569, 575 (D. Conn. 1997) (granting summary judgment on the plaintiff's claim of intentional infliction of emotional distress on the ground that plaintiff failed to set forth any evidence indicating that he suffered his symptoms-i.e., sleeplessness, depression and anxiety-"to an extraordinary degree")); see also Reed v. Signode Corp., 652 F. Supp. 129, 137 (D. Conn. 1986) (granting summary judgment on the plaintiff's claim of intentional infliction of emotional distress and noting that "plaintiff was neither treated nor did he seek medical assistance for the distress he allegedly suffered"). Accordingly, Plaintiff's emotional distress claim must fail on that basis as well, and summary judgment is hereby granted to Defendant on this claim.

## IV.    CONCLUSION

For the aforementioned reasons, Defendant's Motion for Summary Judgment [Doc. No. 21] is **granted** in its entirety. The Clerk shall close the file.

SO ORDERED.

Dated at New Haven, Connecticut, this  29th  day of August, 2007.

                                                /s/
                              _____
                              Peter C. Dorsey, U.S. District Judge
                              United States District Court